UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Darryl Colbert,

     Petitioner,

 vs.         REPORT AND RECOMMENDATION

State of Minnesota, and
Warden Jessica Symmes,

      Respondents.   Civ. No. 06-4407(ADM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. <u>Introduction</u>

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Petitioner's Application for Habeas Corpus relief, under Title 28 U.S.C. §2254. See <u>Docket No. 1</u>.

The Petitioner appears <u>pro se</u>, and the Respondents appear by David C. Brown, Assistant County Attorney for Hennepin County, Minnesota.

For reasons which follow, we recommend that the Petition for a Writ of Habeas Corpus be dismissed.

## II.  Factual and Procedural History[1]

On December 26, 2003, Robert Mitchell ("Mitchell"), and Gladys Rogers ("Rogers"), went to a bar in South Minneapolis to celebrate their engagement with some friends.  At around 5:30 o'clock p.m., the Petitioner entered the bar wearing a long dark coat, and a Fedora style hat.  The Petitioner approached Mitchell and had a brief conversation with him.  Shortly thereafter, Mitchell told Rogers that he was going to buy a television set, and he asked Rogers for some money.  Rogers gave Mitchell $30.00, and Mitchell left the bar taking only the keys to his car.  A surveillance camera at the bar recorded Mitchell, and the Petitioner, leaving the bar together at about 6:00 o'clock p.m.  A few minutes later, three (3) witnesses heard gunshots coming from the street a short distance from the bar.  The witnesses called 911 and, when the police arrived at the scene they found Mitchell lying dead in the street, near his car.  They also found eight bullet shells at the scene.

---

[1]The following summary of the facts of the case is based primarily on the published opinion of the Minnesota Supreme Court in State v. Colbert, 716 N.W.2d 647 (Minn. 2006), and the "Statement of Facts" set forth in the Petitioner's brief in support of his Petition.  See, Brief of the Petitioner, Docket No. 9.

The witnesses who had called 911 told the police that they had seen a white car, and a silver car, parked on the side of the street, facing in opposite directions.  The two cars were backed up to each other, and the trunks of both cars were open. One of the witnesses, a female, noticed that there were two men standing near the cars, talking to each other.  She then saw one of the men pull out a gun, and shoot the other man.  She reported that the shooter then got into the white car and drove away.  Another witness reported that he also saw one of the men fire a gun at the other man, and then saw the shooter get into the white car, and drive away.  The various witnesses to the shooting gave slightly different descriptions of the car, in which the shooter fled, but they all said it was a white sedan.

Two of the three witnesses reported that the shooter was wearing a broad-brimmed dress hat, and all of them reported that the shooter had been wearing a long coat.  Two witnesses were later shown some photographs, which were obtained from the surveillance camera at the bar, and which depicted the Petitioner at the bar just before the shooting.  Both of those witnesses said that the hat and coat worn by the Petitioner were similar to the hat and coat worn by the man who shot and killed Mitchell.

The day after Mitchell was murdered, the Petitioner was involved in another

shooting incident which occurred at an apartment where his nephew, Mark Colbert ("M. Colbert"), was residing.  There was conflicting evidence about how that incident unfolded, but it involved the Petitioner, and a man named Troy Parker ("Parker"), who was an acquaintance of M. Colbert.

M. Colbert was out of town at the time of the shooting at his apartment, and he had asked Parker to watch the apartment while he was gone.  On the evening of December 27, 2003, which was the night after Mitchell's murder, the Petitioner went to M. Colbert's apartment building, and visited a man named Richardson, who also lived in that building.  The Petitioner used Richardson's phone to contact Parker. According to both Parker, and Richardson, the Petitioner told Parker to come to M. Colbert's apartment, because some neighbors had been complaining about the volume of a television set in that apartment.  Richardson later said that, after the Petitioner finished talking to Parker, the Petitioner made some threatening remarks, and put his hands behind his back.  Richardson then heard what sounded like a gun cocking.

After leaving Richardson's apartment, the Petitioner apparently went to the front door of M. Colbert's apartment, and waited for Parker to arrive.  Parker entered the apartment through the back door, and then opened the front door for the Petitioner.

Parker and the Petitioner offered very different explanations of the shooting incident that ensued.

According to Parker, the Petitioner pulled out a gun and shot him in the back of the leg.  Parker and the Petitioner then struggled over the gun, and the Petitioner got shot during the struggle.  After Parker was able to obtain control of the gun, he fired a shot at the Petitioner, and the Petitioner then fled the apartment.

According to the Petitioner, Parker invited him to the apartment to consummate a drug deal.  After the Petitioner entered the apartment, Parker allegedly accused the Petitioner of stealing some crack cocaine.  The Petitioner claims that Parker then pulled out a gun, and shot him in the leg.  A struggle ensued, the gun fired again, and the Petitioner was then able to escape from the apartment.  A friend of the Petitioner was waiting nearby in the Petitioner's car, and drove him to the hospital.

Richardson heard three gunshots, and then called 911.  When the police arrived at M. Colbert's apartment, they found the gun that had been used by Parker and the Petitioner.  Forensic experts later determined that the same gun had been used to murder Mitchell the previous day.

After the shootings at M. Colbert's apartment, the police tracked down the Petitioner, at the hospital where he had been taken for treatment of his wounds.  His

white Chrysler New Yorker was impounded, and taken to a police garage. A police officer, who was investigating Mitchell's murder, saw the Petitioner's car in the garage, and noticed that it matched the description of the car used by Mitchell's murderer. The police then obtained a Search Warrant for the Petitioner's home, and seized a long coat, and Fedora style hat. Sometime thereafter first degree murder charges were filed against the Petitioner for killing Mitchell.

The Petitioner's first Trial resulted in a hung Jury, and a mistrial. At that first Trial, the State's forensics expert offered no definitive testimony as to whether the coat, which had been seized at the Petitioner's home, matched the coat that the Petitioner was wearing when he was videotaped by the bar's surveillance camera, and the prosecution conceded that it was unclear whether the two coats were the same. See, State v. Colbert, 716 N.W.2d 647, 655 (Minn. 2006).

However, during the course of the second Trial, the forensics expert specifically told the prosecuting attorney, at an evening Trial preparation session, that the coat seized from the Petitioner's home, and the coat shown in the bar video, were **not** the same. Id. The prosecutor immediately sent an e-mail message to the defense attorney, in order to inform him of the expert's anticipated testimony about the coats. Id. A day or two later, the defense attorney made a comment, that led the prosecutor to

believe that his e-mail message had been received; but the defense attorney later claimed that he did not receive the e-mail before the expert witness testified at the second Trial.  <u>Id.</u>

After the forensic expert testified that the coats were not the same, the defense moved for dismissal, claiming that the expert's "'new opinion' constituted a change in the prosecution's theory of the case, amounting to a discovery violation." <u>Id.</u>  The Motion to Dismiss was denied, but the Trial Court sought to rectify the alleged discovery violation, by requiring the prosecution to give the defense certain photographs of the coat, that was seized from the Petitioner's home, and allowing the defense to re-examine the police officer who had shown those photographs to the persons who had witnessed the shooting.  <u>Id.</u> at 656.

At the end of the Petitioner's second Trial, the Jury found him guilty of first degree murder.  He was sentenced to life in prison, and he is presently serving his sentence at the Minnesota Correctional Facility, in Oak Park Heights, Minnesota ("MCF-Oak Park").

Following his conviction and sentence, the Petitioner filed a direct appeal with the Minnesota Supreme Court.[2]  In that appeal, the Petitioner raised three (3) claims for relief:

> (1)    the evidence was insufficient to support the conviction;
>
> (2)    the Trial Court erred when it failed to dismiss the case based on an alleged discovery violation by the state during trial; and
>
> (3)    the prosecutor committed prejudicial misconduct.

Id.

The Minnesota Supreme Court rejected all of the Petitioner's claims on their merits, and affirmed his conviction and sentence.  Id.

The Petitioner then filed his current Application for Federal Habeas Corpus relief.  The present Petition lists the same three (3) grounds for relief that were presented in the Petitioner's direct appeal to the Minnesota Supreme Court.

## III.  Discussion

---

[2]Under Minnesota law, appeals in first degree murder cases are taken directly to the State Supreme Court, rather than to the Minnesota Court of Appeals.  See, Minnesota Statutes Section 632.14.

A.    <u>Standard of Review</u>.  "[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  <u>Title 28 U.S.C. §2254(a)</u>.  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991).  As a result, before a Writ may issue, the Petitioner must establish that the State's exercise of custody over his person is an affront to the Constitution, a Federal law, or a Federal treaty.  <u>Id.</u>; see also, <u>Lupien v. Clarke</u>, 403 F.3d 615, 618 (8th Cir. 2005); <u>Newton v. Kemna</u>, 354 F.3d 776, 782 (8th Cir. 2004); <u>Robinson v. Leapley</u>, 26 F.3d 826, 829 (8th Cir. 1994).

In 1996, Congress restricted the scope of a Federal Court's review of Habeas Petitions, where the underlying claims were adjudicated in State Court.  See, <u>Antiterrorism and Effective Death Penalty Act of 1996</u>, Pub. L. No. 104-132, 110 Stat. 1214 (1996)("AEDPA"); see also, <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70 (2003) ("AEDPA circumscribes a federal habeas court's review of a state court decision.").  A Federal Court's authority to vitiate State Court decisions, by the granting of a Writ

of Habeas Corpus, is now limited to the narrow class of claims which have been fully

exhausted in the State Courts, and which involve an adjudication that either:

> (1)    resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the
> United States; or
>
> (2)    resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State Court proceeding.

Title 28 U.S.C. §2254(d).

The Supreme Court has determined that the "contrary to," and "unreasonable

application" clauses of Section 2254(d)(1), present two separate grounds on which a

Federal Court may grant Habeas relief to claims adjudicated in the State Courts.  See,

Williams v. Taylor, 529 U.S. 362 (2000).  The Court has explained, as follows:

> Under the "contrary to" clause, a federal habeas court may
> grant the writ if the state court arrive[d] at a conclusion
> opposite to that reached by [the United States Supreme
> Court] on a question of law or if the state court decide[d]
> a case differently than [the Supreme Court] has on a set of
> materially indistinguishable facts.  Under the "unreasonable
> application" clause, a federal habeas court may grant the
> writ if the state court identifie[d] the correct governing legal
> principle from [the Supreme Court's] decisions but
> unreasonably applie[d] that principle to the facts of the
> prisoner's case.

Id. at 412-13; see also, Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Mark v. Ault, 2007 WL ----------, Slip Op. in Nos. 06-3476/3513 at pp. 13-14 (8th Cir., August 16, 2007).

The Court further explained that the consideration of a State Court's decision, under the "unreasonable application" clause, requires a Federal Court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409; see also, Penry v. Johnson, supra at 792-93; Evanstad v. Carlson, --- F.3d ---, 2006 WL 3436142 at *3 (8th Cir., November 30, 2006); Smulls v. Roper, 467 F.3d 1108, 1113 (8th Cir. 2006); Underdahl v. Carlson, 462 F.3d 796, 798 (8th Cir. 2006).

Under this heightened standard of review, a Federal Court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly," but "[r]ather, that application must also be unreasonable." Id. at 411; see also, Mark v. Ault, supra at p. 18; Underdahl v. Carlson, supra at 798; Siers v. Weber, 259 F.3d 969, 972-73 (8th Cir. 2001)(examining the impact of Williams on Habeas proceedings), cert. denied, 534 U.S. 1138 (2002); Newman v. Hopkins, 247 F.3d 848, 850-51 (8th Cir. 2001), cert. denied, 536 U.S. 915 (2002); Copeland v. Washington, 232 F.3d 969, 973 (8th Cir. 2000), cert. denied, 532 U.S. 1024 (2001).

As a consequence, <u>Williams</u> affirmed the distinction, which had previously been drawn by several Circuit Courts, that the "contrary to" clause was to be used in cases addressing pure questions of law and mixed questions of law and fact, whereas the "unreasonable application" clause addressed factual determinations. See, e.g., <u>Evans v. Rogerson</u>, 223 F.3d 869, 872 (8th Cir. 2000)(the "in custody" determination for <u>Miranda</u> purposes is a question of law subject to the first prong of Section 2254(d), when the relevant facts are undisputed). Therefore, when a petitioner argues that the State Court improperly applied clearly established Supreme Court law to a particular set of facts, the Federal Courts may not grant a Writ absent a finding that such an application was objectively unreasonable.

Additionally, Section 2254(e)(1) retains a presumption of correctness for all purely factual determinations, which are rendered by a State Tribunal, and which can, as a result, only be rebutted by the production of clear and convincing evidence to the contrary. See, <u>Evenstad v. Carlson</u>, supra at *5, citing <u>Cornell v. Nix</u>, 976 F.2d 376, 382 (8th Cir. 1992); <u>Middleton v. Roper</u>, 455 F.3d 838, 845 (8th Cir. 2006); <u>Lupien v. Clarke</u>, 403 F.3d 615, 618 (8th Cir. 2005); <u>Green v. Norris</u>, 394 F.3d 1027, 1029 (8th Cir. 2005).

Despite this presumption, Section 2254(d)(2) authorizes the issuance of a Writ if the State Court Judgment "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Kinder v. Bowersox, 272 F.3d 532, 538 (8th Cir. 2001); Link v. Luebbers, 469 F.3d 1197, 1202 (8th Cir. 2006); McDonald v. Bowersox, 101 F.3d 588, 592 (8th Cir. 1996)("[W]e presume state court findings of fact to be correct in habeas proceedings unless the petitioner establishes, the respondent admits, or the record shows otherwise."), cert. denied, 521 U.S. 1127 (1997). Thus, "[f]actual findings by the state court 'shall be presumed to be correct,' a presumption that will be rebutted only 'by clear and convincing evidence.'" Kinder v. Bowersox, supra at 538, citing Title 28 U.S.C. §2254(e)(1); Lupien v. Clarke, 403 F.3d 615, 618 (8th Cir. 2005)(same).

B.    Legal Analysis.  As we have noted, the Petitioner seeks Habeas relief on the grounds that:  1) the evidence was insufficient to prove the elements of the charge beyond a reasonable doubt ("Ground One"); 2) the Trial Court erred when it failed to dismiss the case based on an alleged discovery violation by the State during the Trial ("Ground Two"); and 3) the prosecutor committed prejudicial misconduct ("Ground Three").  The Respondent opposes the Petition on its merits.

Following a thorough review of the Record presented, we conclude that the decisions of the State Court were neither contrary to, nor did they involve an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, nor were those decisions based upon an unreasonable determination of the facts.  Since they involve somewhat different considerations, we separately address the Grounds advanced by the Petitioner.

      1.    <u>The Petitioner's Assertion that the Evidence Presented at Trial Was Insufficient to Support His Conviction.</u>

      a.    <u>Standard of Review</u>.  On a challenge to the sufficiency of the evidence, the critical inquiry is whether the "record evidence would reasonably support a finding of guilt beyond a reasonable doubt * * *." <u>Jackson v. Virginia</u>, 443 U.S. 307, 318 (1979).  A Jury Verdict will be upheld so long as the reviewing Court determines that "**any** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Id.</u> at 319 (emphasis in original); <u>United States v. Washington</u>, 318 F.3d 845, 852 (8th Cir. 2003).  In making its determination, the reviewing Court must view the evidence, including all permissible inferences to be drawn therefrom, in the light most favorable to the Jury's Verdict.  See, <u>United States v. Beaman</u>, 361 F.3d 1061, 1064 (8th Cir. 2004), citing <u>United States v. McCarthy</u>, 244

F.3d 998, 999 (8th Cir. 2001).  Determinations as to witness credibility are "virtually

unreviewable on appeal because it is preeminently the job of the finder of fact."  Id.

quoting United States v. Morris, 327 F.3d 760, 761 (8th Cir. 2003) cert. denied, 540

U.S. 920 (2003).

           b.    Legal Analysis.  The Petitioner claims that the prosecution

did not present sufficient evidence to allow the Jury to find him guilty beyond a

reasonable doubt, and that his conviction is therefore constitutionally invalid.  Here,

the Minnesota Supreme Court correctly identified the standard of review for an

insufficiency of the evidence claim, as prescribed by the United States Supreme Court

in Jackson v. Virginia, supra.  The Court described this standard of review as follows:

> "[I]n reviewing the sufficiency of the evidence we do not try
> the facts anew.  Our responsibility extends no further than
> to make a painstaking review of the record to determine
> whether the evidence, direct and circumstantial, viewed
> most favorably to support a finding of guilt is sufficient to
> permit the jury to reach that conclusion."

Colbert, supra at 653, quoting State v. Mems, 708 N.W.2d 526, 531-32 (Minn. 2006)
[internal quotations omitted].

Applying this standard of review to the facts before it, the State Supreme Court

concluded that "the evidence leads so directly to [the Petitioner's] guilt as to exclude,

beyond a reasonable doubt, any reasonable inference other than guilt."  Id. at 654.

The Petitioner obviously disagrees with the Jury's view of the evidence, but he has made no effort to show that the Minnesota Supreme Court's resolution of his insufficiency of the evidence claim is contrary to, or is an objectively unreasonable application of, any United States Supreme Court precedent. The State Court correctly identified and articulated the legal standard for adjudicating an insufficiency of the evidence claim, and the State Court's application of that standard to the facts and circumstances of this case was entirely reasonable and proper. The incriminating evidence, which was identified by the State Court amply supported the conclusion that there was sufficient evidence to prove the Petitioner's guilt. Indeed, given the substantial incriminating evidence presented at the Petitioner's Trial, it is hard to imagine that the Jury could have found the Petitioner **not** guilty.

Specifically, the prosecution presented evidence showing that, shortly before Robert Mitchell was murdered, the Petitioner entered a bar where Mitchell was celebrating his engagement. The Petitioner approached Mitchell and talked to him. Shortly thereafter, Mitchell told his fiancee that he needed some money to buy a television. See, Trial Transcript ("Tr."), Docket No. 10, p. 39. Mitchell then said that he was leaving "with Darryl," which is the Petitioner's first name. Tr. 40. The Petitioner has acknowledged that he was in the bar, that he talked to Mitchell, and that

he and Mitchell left the bar at the same time.  Tr. pp. 1155, 1173, 1175.  The Petitioner has further acknowledged, and the bar surveillance video confirms, that he was wearing a long coat and a dark hat when he left the bar.  Tr. 1284.

Within minutes after the Petitioner and Mitchell left the bar together, three (3) witnesses heard the gunshots that killed Mitchell.  Those witnesses saw a man leaving the scene in a white sedan, which is what the Petitioner was driving on the night of the murder.  All of those witnesses testified that the person who shot Mitchell was wearing a long coat, and two of them said the shooter was wearing a broad-brimmed hat.  Again, the Petitioner has acknowledged, and the bar surveillance video confirms, that he was wearing a long coat and a broad-brimmed hat just minutes before the murder.

Furthermore, the day after Mitchell was murdered, the Petitioner was involved in another shooting incident at M. Colbert's apartment.  The incident involved the same gun that was used to kill Mitchell.  According to Parker, the Petitioner brought that gun with him to the apartment, and used that gun to shoot Parker.  Thus, the prosecution presented evidence showing that (a) the Petitioner had the murder weapon in his possession barely twenty-four (24) hours after Mitchell was murdered, and (b) the Petitioner **used** the murder weapon to shoot another man, Parker, barely twenty-four (24) hours after Mitchell's murder.

We recognize that the defense presented some evidence that might arguably be viewed as exculpatory -- most notably, the Petitioner's own self-serving testimony. However, it was up to the Jury to assess the credibility of that evidence, and determine how much weight it should be given.  See, Brooks v. Tennessee, 406 U.S. 605, 611 (1972) ("our adversary system reposes judgment of the credibility of all witnesses in the jury").  The Jury's assessment of the Petitioner's testimony in this case was undoubtedly influenced by the Petitioner's candid admission that he repeatedly lied to the police about the events that occurred at M. Colbert's apartment on December 27, 2003.  Tr. 1301-06.  In any event, the Jurors were free to reject the exculpatory evidence offered by the defense and, as the Minnesota Supreme Court aptly noted, they "evidently did."  Colbert, supra at 654.

In sum, we find that the State Court correctly ascertained, and reasonably applied, the decisions of the United States Supreme Court that govern an insufficiency of the evidence claim.  Viewing the evidence most favorably to the Jury's Verdict, there was more than sufficient evidence to support that Verdict.  Therefore, we conclude that the Petitioner is not entitled to a Writ of Habeas Corpus on his insufficiency of the evidence claim.

   2.   The Petitioner's Claim That the Prosecution Failed to Disclose Exculpatory Evidence.

      a.   Standard of Review.   "The interest of the Government in any criminal prosecution 'is not that it shall win a case but that justice shall be done.'"  Dye v. Stender, 208 F.3d 662, 665 (8th Cir. 2000), quoting Lingle v. Iowa, 195 F.3d 1023, 1026 (8th Cir. 1999), quoting in turn, Berger v. United States, 295 U.S. 78, 88 (1935). "'For this reason * * * the prosecution is required to divulge all evidence favorable to the accused that is material either to guilt or to punishment,' a rule known as the Brady rule."  Id., see, Brady v. Maryland, 373 U.S. 83, 87 (1963).  To prevail on a Brady duty-to-disclose claim, a defendant must first identify some specific exculpatory evidence that was known to the prosecution before his Trial, but did not become known to him until after the Trial.  See, United States v. Gonzales, 90 F.3d 1363, 1368 (8th Cir. 1996).  In addition, a defendant "must show that: (1) the prosecution suppressed evidence, (2) that the evidence was favorable to the accused, and (3) the evidence was material."  Id., see also, Banks v. Dretke, 540 U.S. 668, 691 (2004); United States v. Carman, 314 F.3d 321, 324 (8th Cir. 2002); Johns v. Bowersox, 203 F.3d 538, 545 (8th Cir. 2000).

Evidence will only be material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Clay v. Bowersox, 367 F.3d 993, 1000 (8th Cir. 2004), quoting United States v. Bagley, 473 U.S. 667, 682 (1985); see also, Morales v. Ault, 476 F.3d 545, 554 (8th Cir. 2007), citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  A reasonable probability exists when the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Burton v. Dormire, 295 F.3d 839, 847 (8th Cir. 2002), quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995), see, Dye v. Stender, supra at 666, quoting United States v. O'Conner, 64 F.3d 355, 358 (8th Cir. 1995).  "Materiality 'is not established through the mere possibility that the suppressed evidence might have influenced the jury.'"  United States v. Carman, supra at 324, quoting United States v. Ryan, 153 F.3d 708, 711 (8th Cir. 1998).  In the absence of materiality, any failure to disclose information to a defendant will be considered harmless error.  See, Dye v. Stender, supra at 665, citing United States v. Williams, 194 F.3d 886, 889 (8th Cir. 1999).

    b. Legal Analysis.  The Petitioner contends, in Ground Two of his Petition, that his conviction should be set aside because the prosecution did not properly disclose certain allegedly exculpatory evidence.  The evidence in question is

the opinion of an expert videotape analyst regarding the coat that the Petitioner was wearing on the night of Mitchell's murder.  On the eve of that expert's appearance at the Petitioner's second Trial, he told the prosecutor that the coat the Petitioner was wearing on the night of the murder, as shown on the videotape obtained from the bar, was definitely **not** the coat that was later seized from the Petitioner's home.  Although the prosecution sent an e-mail notice to the Petitioner's attorney that evening, informing him of the change in the expert witness's opinion, the Petitioner claims that his attorney did not receive the e-mail right away, and did not learn of the expert witness's opinion until the witness testified.

The Petitioner has repeatedly contended, at Trial, on direct appeal, and again here, that he was prejudiced by the alleged late disclosure of the expert witness's opinion about the coat evidence.  He claims that he was prejudiced, because he was not able to use the expert witness's opinion to impeach one of the prosecution's witnesses.  The Petitioner further claims that the evidence in question precipitated a change in the prosecution's theory of the case, which he was not able to counter effectively, because of the alleged delay in the disclosure of the expert witness's opinion.  We find the Petitioner's failure-to-disclose claim to be unsustainable, for several reasons.

First, the Minnesota Supreme Court correctly recognized that (1) "[t]he prosecution must * * * disclose all exculpatory evidence to the defense," and (2) "'a reviewing court ordinarily should not order a new trial if no reasonable probability exists that the outcome of the trial would have been different if the evidence had been available.'" Colbert, supra at 655, citing Brady v. Maryland, supra at 87, and quoting State v. Freeman, 531 N.W.2d 190, 198 (Minn. 1995). The Petitioner has not suggested that this synopsis of the relevant legal principles is erroneous in any respect, and we find it to be wholly consistent with, and not contrary to, the Supreme Court's decisions in Brady, Kyles and Bagley.

Furthermore, we find nothing unreasonable about the Minnesota Supreme Court's application of Brady, and its progeny, in this case. The State Supreme Court did not discuss, or decide, whether the evidence at issue was, in fact, exculpatory, and did not discuss, or decide, whether the prosecution's late disclosure of that evidence actually was improper. Instead, the State Court focused on the prejudice issue, and asked whether the outcome of the Trial would have probably been different if the expert witness's opinion had been disclosed to the defense before the Trial began.[3]

---

[3]We note that, even if the Petitioner's Brady claim were being reviewed de novo, rather than under the AEDPA standards, we would find that no Brady violation

(continued...)

The Minnesota Supreme Court first considered the Petitioner's contention that he was prejudiced because he was not able to use the expert witness's opinion, regarding the coat evidence, to impeach a prosecution witness who had testified before that opinion was disclosed. The Court rejected that argument because the Trial Court had allowed the defense to re-call the prosecution witness in question. The defense then had an opportunity to attempt to impeach that witness, based on the expert witness opinion that had been disclosed during the course of the Trial. The Minnesota Supreme Court reasoned that the alleged prejudice had been eliminated because "the trial court put [the Petitioner] in the same position he would have been in if he had known of the video analyst's 'new opinion' earlier." Colbert, supra at 656. In other words, the remedial action prescribed by the Trial Court allowed the Petitioner to use the expert witness's opinion for the impeachment purposes the Petitioner has in mind, which effectively vitiated his first prejudice argument. The Petitioner has not identified

_____

[3](...continued)
occurred, based solely on the fact that the evidence at issue was disclosed before the end of the Petitioner's Trial. See, United States v. Gonzales, 90 F.3d 1363, 1368 (8th Cir. 1996)("[I]n this Circuit, the rule of Brady is limited only to the discovery, **after trial**, of information which had been known to the prosecution but unknown to the defense," and "[w]**here the prosecution delays disclosure of evidence, but the evidence is nonetheless disclosed during trial, Brady is not violated**.")[Citations omitted; emphasis added].

any flaw in that analysis, and we find it to be an entirely reasonable application of the Brady rule.

The State Supreme Court also rejected the Petitioner's contention, that he was prejudiced because he was not able to prepare for the alleged change in the prosecution's "theory of the case." According to the Petitioner, the prosecution initially attempted to incriminate him by showing that the coat seized from his residence was the coat worn by Mitchell's murderer. When the expert witness said that the coat seized from the Petitioner's home was not the same coat that the Petitioner was wearing in the bar surveillance video, the prosecution supposedly had to come up with a different theory; namely, that the two coats were different but showed that the Petitioner had a penchant for long coats. The Petitioner claims that he was prejudiced because he did not have a chance to develop a rebuttal for this theory.

The State Supreme Court rejected that second prejudice argument, because the Record showed that the prosecution's theory of the case was **not** affected by the expert witness's opinion on the coats. The State Court found that the prosecution **consistently** argued, at both Trials, that it did not matter whether the coat taken from the Petitioner's home actually was the same coat that he was wearing on the night of Mitchell's murder. Instead, the prosecution argued that what really mattered was the

similarity between the coat worn by the Petitioner in the bar surveillance video, and the coat that the eyewitnesses saw the murderer wearing.[4]

We find the Minnesota Supreme Court's analysis of the Petitioner's second prejudice argument to be altogether reasonable. Whether the coat seen in the bar video is the same as the coat seized from the Petitioner's home is essentially irrelevant. What is relevant is the eyewitness match between the coat seen in the bar video, and the coat worn by the murderer, which was the point that the prosecution consistently tried to make, and that point was unaffected by the expert witness's opinion regarding the coat seized from the Petitioner's home.[5]   Therefore, we agree with the State Supreme

_____

[4]This consistency in the prosecution's argument is additionally revealed in the Petitioner's own brief in support of his current Habeas Petition. He cites several instances where the prosecution highlighted the match between the coat the Petitioner wore at the bar, and the coat worn by the shooter, while failing to mention the coat found in the Petitioner's home. See, Brief of the Petitioner, Docket No. 9, pp. 35-36.) The Minnesota Supreme Court commented on this in the following terms:

> Interestingly, it appears that the excerpts of the state's closing argument from Colbert's first trial that Colbert uses to support his argument actually reference the state's argument that the coat Colbert wore on December 26 was the same coat witnesses saw the shooter wearing when he shot Mitchell.

State v. Colbert, 716 N.W.2d 647, 656 (Minn. 2006).

[5]The coat seized from the Petitioner's home might be relevant, if there were
(continued...)

Court, and find no prejudice to the defense that arises from the prosecution's allegedly late disclosure of the expert witness's coat testimony.  Since the Petitioner has failed to show that he was prejudiced, his <u>Brady</u> claim must be rejected.

        3.      <u>The Petitioner's Allegation of Prosecutorial Misconduct</u>.

        a.      <u>Standard of Review</u>.  "We will reverse a conviction for prosecutorial misconduct only if "(1) the prosecutor's remarks or conduct were improper, and (2) the remarks or conduct prejudicially affected the defendant's substantial rights so as to deprive him a fair trial."  <u>United States v. Ziesman</u>, 409 F.3d 941, 953 (8th Cir. 2005), cert. denied, --- U.S. ---, 126 S. Ct. 579 (2005), quoting <u>United States v. Beckman</u>, 222 F.3d 512, 526 (8th Cir. 2000).  "If we reach the second step, we consider '(1) the cumulative effect of the misconduct, (2) the strength of the properly admitted evidence of the defendant's guilt, and (3) any curative actions taken by the trial court.'"  <u>United States v. Londondio</u>, 420 F.3d 777, 787 (8th Cir. 2005), quoting <u>United States v. Ziesman</u>, supra at 953, quoting, in turn, <u>United States v. Beckman</u>, supra at 526.

─────────────

[5](...continued)
questions about whether the Petitioner actually was at the bar on the night of the murder, or as to what he was wearing that night.  But those matters were never at issue, because the Petitioner admitted he was at the bar, and the video images showed what he was wearing.

Thus, a Habeas petitioner "bears the heavy burden of showing that the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair."  Mack v. Casper, 92 F.3d 637, 643 (8th Cir. 1996), cert. denied, 520 U.S. 1109 (1997), citing Jones v. Jones, 938 F.2d 838, 844-45 (8th Cir. 1991); see also, Moore v. Wyrick, 760 F.2d 884, 886 (8th Cir. 1985); Roberts v. Bowersox, 137 F.3d 1062, 1066 (8th Cir. 1998) (prosecutorial misconduct does not merit habeas corpus relief unless the prosecutor committed an error that effectively eliminated the defendant's due process right to a fair Trial), cert. denied, 525 U.S. 1073 (1999), citing Darden v. Wainwright, 477 U.S. 168, 181 (1986).

b.    Legal Analysis.   In Ground Three of his Petition, the Petitioner claims that he was deprived of his Fourteenth Amendment right to a fair Trial because of alleged misconduct by the prosecution.  The claim is based upon three (3) incidents:  (1) during closing arguments, the prosecutor pointed out that the Petitioner had been unfaithful to his fiancee; (2) during cross-examination of the Petitioner, and again during closing arguments, the prosecutor pointed out that the Petitioner had been able to hear the testimony of prior witnesses, and therefore, he was able to tailor his own testimony to fit the existing record; and (3) during closing arguments, the prosecutor made an argument that was not supported by the evidence.

- 27 -

In its review of his case, the Minnesota Supreme Court concluded that, "if any of the conduct underlying the [Petitioner's] claims constituted prosecutorial misconduct, none of the conduct alleged, whether viewed as discrete instances of misconduct or collectively, was so serious or prejudicial as to deny [the Petitioner] a fair trial." Colbert, supra at 657. The Court's observation is fully consistent with the applicable decisions of the United States Supreme Court, and of our Court of Appeals, which shows that the Petitioner's prosecutorial misconduct claims were adjudicated based upon the appropriate legal standard. We also find that there is nothing unreasonable about the manner in which the Minnesota Supreme Court applied the controlling legal standards to the facts and circumstances of this case.

Initially, we note that the prosecutor's comments about the Petitioner's unfaithfulness to his fiancee are fully supported by the Petitioner's own testimony. The Petitioner testified that, at the time of Mitchell's murder, he was engaged to a woman named Alberta. Tr. 1270-71. He also testified that, during the early morning hours after Mitchell's murder, he had sex with another woman in a hotel room. Tr. 1312. The Petitioner further testified that, on the day following Mitchell's murder, he went to the house of yet another woman and "fell asleep" there. Tr. 1313.

Presumably, the prosecutor commented on the Petitioner's unfaithfulness, during closing argument, so as to question the Petitioner's credibility.

The Minnesota Supreme Court concluded that, regardless of the purpose or propriety of the prosecutor's remarks about the Petitioner's infidelity, those remarks, viewed in the context of the Trial as a whole, were not so harmful that they deprived the Petitioner of his right to a fair Trial.   We cannot find that conclusion to be objectively unreasonable.  See, Sublett v. Dormire, 217 F.3d 598, 601 (8th Cir. 2000) (State Court's "determination that the closing argument did not violate due process was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"), cert. denied, 531 U.S. 1128 (2001).

The Petitioner next claims that he was denied due process because the prosecutor pointed out that the Petitioner had an opportunity to review the evidence turned over to the defense during the course of pre-Trial discovery, and to hear the testimony of other witness at Trial.  According to the Petitioner, that comment allowed the Jury to infer that the Petitioner could have shaped his own testimony to fit the existing evidentiary record.  Simply put, we cannot  improve on the Petitioner's own explanation of why the claim must fail.  As the Petitioner has candidly and cogently

stated: "The United States Supreme Court has ruled that the Federal Constitution does not proscribe prosecutorial comment about a defendant's ability to tailor testimony to the facts presented at trial," <u>Brief of the Petitioner</u>, <u>Docket No. 9</u>, at p. 47, which accurately summarizes the holding of the Supreme Court in <u>Portuondo v. Agard</u>, 529 U.S. 61 (2000).

The Petitioner apparently recognizes that, in light of <u>Portuondo</u>, he cannot plausibly claim that the prosecutor violated his **Federal** constitutional rights by drawing attention to his opportunity to tailor his testimony. He argues, instead, that the prosecutor violated his rights under the Minnesota **State** Constitution. While that might have been a proper argument to advance on direct appeal, it cannot be entertained here, because it is well-settled that Federal Habeas Corpus relief is available to State prisoners only for **Federal** constitutional violations. See, <u>Title 28 U.S.C. § 2254(a)</u>; see also, <u>Estelle v. McGuire</u>, supra at 67 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). Since the Petitioner's second prosecutorial misconduct claim is based solely upon the Minnesota State Constitution, and cannot be based on the United States Constitution in light of <u>Portuondo</u>, that claim must be denied.

The Petitioner's final prosecutorial misconduct claim stems from another remark that the prosecutor made during closing arguments.  Anticipating that the Jury might wonder where the Petitioner kept the murder weapon prior to the shooting, or the coat that he was allegedly wearing on the night of the murder, the prosecutor said: "I submit to you that the defendant has clothes and property in many places," and "[h]e has as many places to hide whatever he needs hidden as he has women." Tr. 1477.  The Petitioner's attorney objected to this argument, claiming that there was no evidence in the record to support it.  However, the Trial Court Judge overruled the objection, telling defense counsel, "It's argument and you may respond." Id.

The Petitioner claims that this argument was improper, and that it was prejudicial because it related to "the fundamental issues of the case: Credibility of the defense witnesses, including [the Petitioner] himself." Brief of the Petitioner, supra at p. 50. The Minnesota Supreme Court rejected the argument, and we find nothing unreasonable in that determination.

First, we note that the prosecutor's argument as to the potential hiding places for the Petitioner's property has no readily apparent relevance to the credibility of the Petitioner, or any other defense witness.  The Petitioner has not shown that the location of any particular piece of property, before or after the murder, generated any

conflicting testimony that might have raised concerns about the credibility of any witnesses. The location of the Petitioner's property simply was not a significant issue in this case.

Furthermore, the Petitioner's credibility had already been seriously damaged, before closing arguments, by his own admission that he repeatedly lied to the police about the shootings at Mark Colbert's apartment. The prosecutor's obscure remarks about the potential hiding places for the Petitioner's property could have inflicted little, if any, additional damage to the Petitioner's already dubious credibility. Looking at the Record as a whole, we find that, even if the prosecutor's hiding place remarks were somehow detrimental to the Petitioner, they were not so shocking or egregious that they effectively despoiled the entire Trial. Since the Petitioner has not shown that the prosecutor's remarks probably altered the outcome of his Trial, he cannot be granted relief on his final prosecutorial misconduct claim.

In sum, we find that the Minnesota Supreme Court's resolution of the Petitioner's three (3) Grounds for relief was neither contrary to, nor an unreasonable application of, any United States Supreme Court precedent. Accordingly, we conclude that the Petitioner cannot be granted a Writ of Habeas Corpus on any of the

claims raised in his Petition, and therefore, we recommend that his Petition be dismissed with prejudice.

NOW, THEREFORE, It is  –

RECOMMENDED:

That the Petition for a Writ of Habeas Corpus [Docket No. 1] be dismissed with prejudice.

BY THE COURT:

Dated:  August 16, 2007                    s/Raymond  L. Erickson
                                           Raymond L. Erickson
                                           CHIEF U.S. MAGISTRATE JUDGE

NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 31, 2007,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this

procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 31, 2007,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.